# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

| | |
|---|---|
| LANNY GRAMMER, individually and as the Executor of the Estate of Clara Grammer,<br><br>     Plaintiff,<br><br>     v.<br><br>MARK EDWARD FERLIN and SAMUEL CORNELIUS CHAMBERS,<br><br>     Defendants. | No. 2:19—CV-157 |

## ORDER

Before the Court are Defendant Samuel Chambers's and Defendant Mark Ferlin's Motions to Dismiss Counts Three and Four of Plaintiff's Complaint, dkt. nos. 17, 18. For the reasons stated below, Defendants' Motions to Dismiss Counts Three and Four are **GRANTED**.

## BACKGROUND[1]

This suit centers around Plaintiff Lanny Grammer's allegation that Defendant Chambers and Defendant Ferlin wrongfully reduced the life insurance death benefit of Plaintiff's deceased wife,

---

[1] For the purposes of ruling on Defendants' Motions to Dismiss, the Court takes Plaintiff's version of the facts as true. <u>Am. United Life Ins. Co. v. Martinez</u>, 480 F.3d 1043, 1057 (11th Cir. 2007) ("[W]hen ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true.").

Clara Grammer ("Mrs. Grammer"), on the eve of her passing. Dkt. No. 1-1 ¶ 13. Prior to Mrs. Grammer's passing, Mrs. Grammer was covered under a group life insurance policy pursuant to her employment with the Glynn County Board of Education. Id. ¶¶ 17, 18. This group life insurance policy was issued by insurer Metropolitan Life Insurance Company ("Met"). Id. ¶ 18. Mrs. Grammer retired in the summer of 2018 after she was diagnosed with terminal cancer. Id. ¶¶ 19, 20. On July 31, 2018, in light of Mrs. Grammer's retirement, Met contacted Mrs. Grammer to inform her that her group life insurance would not continue, but that she could port or convert her coverage to a personal policy in the amount of $189,000—the amount of her coverage at the time of her retirement. Id. ¶ 22; id. at 25.

On August 18, 2018, Met contacted Mrs. Grammer again, providing the conversion and portability paperwork and informing Mrs. Grammer that she could request "a local MassMutual financial professional" to contact her directly to help with the transition. Id. ¶ 23; id. at 28. Apparently, MassMutual ("Mass") purchased Met (collectively, "Met/Mass") circa 2016. Id. ¶ 24. The Grammers contacted Met to avail themselves of that offered assistance, and in response, Met directed Defendant Ferlin to assist Mrs. Grammer in the conversion/portability process. Id. ¶¶ 25, 26. Defendant Ferlin, a Florida resident, was properly licensed to engage in insurance activities in Georgia and appointed by Met/Mass to act

2

as its agent in insurance transactions. Id. ¶¶ 3, 27; id. at 19–20. After speaking with the Grammers several times, Defendant Ferlin directed Defendant Chambers, also a Florida resident, to travel to Georgia to oversee Mrs. Grammer's conversion/portability. Id. ¶¶ 7, 28. Defendant Chambers was licensed to engage in insurance activities in Georgia, but he was not appointed as an agent for Met/Mass. Id. ¶ 29; id. at 22–23.

Without telling the Grammers that Defendant Chambers was not a Met/Mass agent, Defendant Ferlin arranged for Defendant Chambers to travel to the Grammers' home in Brunswick, Georgia, for a meeting on August 30, 2018. Id. ¶¶ 30, 31. Defendant Chambers met with the Grammers for almost eight hours, discussing the conversion/portability of Mrs. Grammer's coverage and other financial concerns the Grammers had regarding Mrs. Grammer's anticipated passing. Id. ¶ 33. Defendant Chambers made numerous representations during this meeting that he was a Met/Mass agent. Id. ¶ 34. Mrs. Grammer told Defendant Chambers that she wanted to keep the entire $189,000 life insurance policy in force, and Defendant Chambers represented that the entire $189,000 would indeed be converted. Id. ¶¶ 35, 36. Defendant Chambers had Mrs. Grammer sign an incomplete form for the conversion/portability and told her that he would fill in the rest later. Id. ¶ 36. Plaintiff alleges that during this meeting, Defendant Chambers sold an additional individual insurance policy to Plaintiff, which was

3

unnecessary and solely for Defendant Chambers's financial benefit. Id. ¶¶ 38–40.

According to the Complaint, Defendant Chambers incorrectly completed the conversion paperwork in the following ways: he misstated Mrs. Grammer's income, her designated beneficiaries, and the amounts of death benefit to go to those beneficiaries; he also reduced Mrs. Grammer's death benefit from $189,000 to $39,000, which was contrary to her express wishes. Id. ¶¶ 41–43. Ultimately, Defendant Ferlin submitted this erroneous paperwork to Met/Mass without raising any questions as to the errors or suspicious reduction in death benefit. Id. ¶ 44.

Plaintiff, individually and as the executor of Mrs. Grammer's estate, filed this suit in the Glynn County Superior Court on November 7, 2019. See id. at 3 (the "Complaint"). Plaintiff alleges four substantive claims against Defendants—negligence (Count 1), gross negligence (Count 2), deceptive trade practices (Count 3), and unfair business practices (Count 4)—along with claims for punitive damages and attorney's fees. Id. ¶¶ 53–76. Defendants jointly removed the case to this Court on December 13, 2019. See Dkt. No. 1 at 1. Defendants then filed the present motions seeking dismissal of Counts 3 and 4 (the "Motions") on February 20, 2020. Dkt. Nos. 17, 18.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  While this pleading standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In order to withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).  A complaint is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

It is important to note that while the factual allegations set forth in the complaint are to be considered true at the motion to dismiss stage, the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.  The court need not "accept as true a legal

5

conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.

Lastly, the Court notes that exhibits attached to pleadings become part of a pleading. Fed. R. Civ. P. 10(c). Consequently, a court may consider documents attached to a complaint as exhibits in resolving a motion to dismiss without converting the motion to one for summary judgment. Taylor v. Appleton, 30 F.3d 1365, 1368 n.3 (11th Cir. 1994)

**DISCUSSION**

Defendants' respective Motions set forth the same arguments and will therefore be addressed in tandem. Compare Dkt. No. 17 with Dkt. No. 18. To start, the Court notes that Plaintiff has consented to dismissal of Count 3—the deceptive trade practices claim. See Dkt. No. 21 at 5. Count 3 will therefore be dismissed without further discussion. However, Plaintiff opposes dismissal of Count 4—the unfair business practices claim. See id. Accordingly, this Order will focus on the sufficiency of Plaintiff's allegations as to Count 4.

Defendants argue that Count 4—which is brought under the Georgia Fair Business Practices Act (the "FBPA")—should be dismissed under Rule 12(b)(6) for two reasons.[2] First, Defendants

---

[2] Defendants acknowledged during the October 13, 2020 motions hearing that they are standing down on their argument as to sufficiency of Plaintiff's notice allegations. See Dkt. No. 17 at 7 (arguing that Plaintiff failed to allege delivery of notice required by O.C.G.A. § 10-1-399(b)). This Order will therefore only address Defendants' remaining two arguments for dismissal.

6

argue that insurance transactions are exempt from the FBPA, and Plaintiff's claims are thus exempt because they "relate to an insurance transaction." Dkt. No. 17 at 5-6. Second, Defendants argue that the FBPA does not apply to the transaction at hand because it fails the FBPA's consumer marketplace requirement. Id. at 5-7. The Court concludes the subject transaction *is* exempt from the FBPA and the claim must be dismissed. Therefore, the Court need not address Defendants' consumer marketplace argument.

Defendants argue that Count 4 should be dismissed because, in general, "insurance transactions are . . . exempt from the [FBPA]." Id. at 6 (quoting Deotare v. Wells Fargo Bank, N.A., No. 1:17-cv-699, 2018 WL 1470897, at *9 (N.D. Ga. Mar. 26, 2018)). They point out that the FBPA specifically exempts from its coverage "[a]ctions or transactions specifically authorized under laws administered by or rules and regulations promulgated by any regulatory agency of this state or the United States." Id. (quoting O.C.G.A. § 10-1-396(1)). Because insurance transactions "are subject to an extensive regulatory regime . . . pursuant to Title 33 of the Georgia Code," Defendants argue, the transaction at issue in this case is not covered by the FBPA. Id. (citing Ferguson v. United Ins. Co. of Am., 293 S.E.2d 736, 737 (Ga. Ct. App. 1982)).

Plaintiff argues Defendants' proposition that "all unfair business practices occurring during any transaction relating to insurance are exempt from the FBPA" is too "sweeping." Dkt. No.

7

21 at 6.  Plaintiff directs the Court's attention to Defendants' *specific* acts and omissions alleged in the Complaint and argues that this specific conduct is not regulated by any state or federal law.  Id. at 7.  In support of this narrower interpretation of the FBPA exemption, Plaintiff cites two cases out of the Northern District of Georgia as being "scrutinous of the exemptions, so that the[ exemptions] do not swallow the intent of the FBPA." Id. (citing Kitchen v. Ameriquest Mortg. Co., No. 1:04-CV-2750, 2005 WL 6931610 (N.D. Ga. Apr. 29, 2005)); Stroman v. Bank of Am. Corp., 852 F. Supp. 2d 1366, 1381 (N.D. Ga. 2012)).  In Kitchen, the court found that although state and federal laws governed the conduct of mortgage brokers generally, the defendant had not shown "that the *conduct* about which Plaintiff complains [wa]s being regulated." Id. at 8 (quoting Kitchen, 2005 WL 6931610, at *7).  And in Stroman, the same court held the defendants' argument "that the FBPA does not apply to residential mortgage transactions . . . [was] an overly broad interpretation of the statute's exemption."  Id. (quoting Stroman, 852 F. Supp. 2d at 1381).

In the present case, Plaintiff argues the following conduct violates the FBPA and is unregulated by insurance rules and regulations: Defendant Ferlin's "pawn[ing] off his obligations [on] Defendant Chambers, coordinat[ing] the meeting with [the Grammers], [and] receiv[ing] and pass[ing] along paperwork which he had not witnessed the execution of," as well as Defendant

Chambers's "negligently fail[ing] to identify that [h]e was not authorized to transact business with Met Life, represent[ing] that the entire death benefit amount would be converted/ported, allow[ing] Mrs. Grammer to sign a blank form, and, later, incorrectly fill[ing] in that blank form." Id. (citing Dkt. No. 1-1). Plaintiff also alleges in his Complaint that Defendants violated the FBPA by "misrepresent[ing] their affiliation with Met\Mass, misrepresent[ing] the affiliation between the Defendants, and otherwise ma[king] misrepresentations in violation of the [FBPA]." Dkt. No. 1-1 ¶ 66. Because Defendants had not identified any specific rules or regulations governing *those* acts and omissions, and instead "rely on a blanket statement from a case," Plaintiff argues, Defendants failed to meet their burden and are not entitled to dismissal of Count 4. Dkt. No. 21 at 9.[3]

Defendants argue in reply that "Plaintiff['s] argument is too narrowly drawn" and point out that Plaintiff "do[es] not cite to any case in which an action brought under the FBPA was successfully

---

[3] Plaintiff makes two other arguments as to the FBPA exemption, but neither is availing. First, Plaintiff argues that the Insurance Code's regulation of unfair trade practices applies only to insurance companies, not insurance agents themselves. See id. at 7. However, as Defendants point out, this is plainly untrue. See Dkt. No. 25 at 4 (citing O.C.G.A. §§ 33-6-2, 33-6-3, and 33-6-6(a)); Dkt. No. 28 at 5 n.7, 9. Second, Plaintiff argues that even if Defendants' actions were regulated, the Court should allow this FBPA claim because, otherwise, there is no remedy available to an injured consumer like Plaintiff in this situation. Dkt. No. 21 at 9. Plaintiff argues the Insurance Code's regulations "only provide[] permissive jurisdiction to the Insurance Commissioner" such that any remedy is either not available or insufficient. See id.; Dkt. No. 30 at 3-4. However, the FBPA says nothing about its exemption applying only where the regulatory framework provides a sufficient remedy. See O.C.G.A. § 10-1-396(1).

9

maintained against an insurance agent." Dkt. No. 25 at 3; see also Dkt. No. 28 at 4. Defendants distinguish Kitchen by arguing that, in that case, the defendant's attorney simply failed to identify how the subject mortgage broker's actions were regulated—but here, "there is specific evidence that the conduct complained of is being regulated." Dkt. No. 25 at 3-4 (citing Kitchen, 2005 WL 6931610, at *7). Thus, Defendants argue, this was not only an insurance transaction, which generally exempts it from the FBPA, but the specific conduct alleged is also regulated by the Georgia Insurance Code and Rules and Regulations. Id. at 4 (citing O.C.G.A. § 33-6-1 et seq.; Ga. Comp. R. & Regs. 120-2-1-.01 et seq.). Specifically, Defendants point to O.C.G.A. § 33-6-3, which prohibits insurance agents from engaging in unfair or deceptive trade acts or practices in the business of insurance; O.C.G.A. § 33-6-4, which lists examples of unfair or deceptive practices; the Insurance Commissioner's regulation 120-2-11.10, which prohibits making or using misleading or unfair statements; and regulation 120-2-31-.06(2), which requires life insurance agents to announce the insurance company they represent to prospective purchasers.[4] Dkt. No. 25 at 4; Dkt. No. 28 at 6–8. Because these

---

[4] Defendants also argue that O.C.G.A. § 33-23-28 and regulation 120-2-3-.07 regulate Defendants' alleged conduct, but these rules are inapplicable to Defendants. See Dkt. No. 28 at 7–9. Section 33-23-28 imposes limitations on *sub*-agents' authority; Plaintiff does not allege that Defendants are subagents. See O.C.G.A. § 33-23-28; Dkt. No. 1-1. Further, regulation 120-2-3-.07 applies to resident agents; Defendants are *non*-resident agents. See Ga. Comp. R. & Regs. 120-2-3-.07; Dkt. No. 1-1 at 19, 22.

10

provisions regulate Defendants' alleged conduct, Defendants argue, Count 4 should be dismissed.

Courts applying Georgia law have taken two main approaches in determining the expanse of the FBPA exemption.  One line of cases employs a broad interpretation of the FBPA exemption, holding that any transaction occurring within a regulated area of activity is exempt from the FBPA.  See, e.g., Sheppard v. Bank of Am., N.A., 542 F. App'x 789, 793 (11th Cir. 2013) (holding that the FBPA does not apply to loan lending and servicing); see also Kuchenmeister v. HealthPort Techs., LLC, 309 F. Supp. 3d 1342, 1359 (N.D. Ga. 2018) (holding that the FBPA does not apply to medical records processing because it is an "extensively regulated area[] of the marketplace"), aff'd, 753 F. App'x 794 (11th Cir. 2018); Cass v. TitleMax of Ga., Inc., No. 1:17-cv-02479, 2018 WL 1916401, at *8 (N.D. Ga. Apr. 12, 2018) (dismissing FBPA claim because pawn transactions are an "extensively regulated area[] of the marketplace" (quoting Brogdon ex rel. Cline v. Nat'l Healthcare Corp., 103 F. Supp. 2d 1322, 1336 (N.D. Ga. 2000))), report and recommendation adopted, No. 1:17-CV-2479, 2018 WL 3688938 (N.D. Ga. May 16, 2018); Winston v. 360 Mortg. Grp., LLC, No. 1:17-CV-1186-WSD, 2017 WL 4356918 (N.D. Ga. Oct. 2, 2017) (dismissing FBPA claim because mortgaging lending and/or servicing transactions are "regulated areas of activity"); Woodfork v. MidFirst Bank, No. 1:16-cv-01727, 2016 WL 11581821, at *7 (N.D. Ga. Sept. 9, 2016)

11

(dismissing FBPA claim because the FBPA does not apply to residential mortgage transactions), report and recommendation adopted, No. 1:16-CV-1727, 2016 WL 11581975 (N.D. Ga. Oct. 20, 2016); Wynn v. Nationstar Mortg., LLC, No. 2:17-CV-00010, 2017 WL 8218964, at *5 (N.D. Ga. Apr. 28, 2017) ("[T]he weight of authority indicates that FBPA claims are not available for foreclosure claims arising out of the heavily regulated area of mortgage loan servicing."), report and recommendation adopted, No. 2:17-CV-00010, 2017 WL 8218956 (N.D. Ga. June 22, 2017); see also Ne. Ga. Cancer Care, LLC v. Blue Cross & Blue Shield of Ga., Inc., 676 S.E.2d 428, 434 (Ga. Ct. App. 2009) (comparing the exemption provision in the Georgia Uniform Deceptive Trade Practices Act to that in the FBPA and dismissing plaintiff's claim because "claims of unfair trade practices in insurance transactions are governed by the Insurance Code").

Another line of cases, spearheaded by Kitchen and Stroman, favors a narrow interpretation of the FBPA exemption, holding that the FBPA exempts only specific *conduct* that is subject to state or federal regulations. See, e.g., Kitchen, 2005 WL 6931610; Stroman, 852 F. Supp. 2d 1366; Colonial Life & Accident Ins. Co. v. Am. Fam. Life Assurance Co., 846 F. Supp. 454, 462 (D.S.C. 1994) ("[C]onduct which is *specifically regulated* in the Insurance Code— including false advertising by insurance companies—is exempt from coverage under the GFBPA." (emphasis added)) (applying Georgia

12

law); Brogdon ex rel. Cline v. Nat'l Healthcare Corp., 103 F. Supp. 2d 1322, 1336–37 (N.D. Ga. 2000) ("Plaintiffs' Complaint contains allegations about a singular concern: the deficient level of care provided by Defendants to Plaintiffs. . . . [But the FBPA claim must be dismissed because] federal and state agencies regulate the *precise conduct* about which Plaintiffs complain." (emphasis added)); Morris v. Bank of Am., N.A., No. 3:18-CV-157, 2019 WL 1421166, at *3 (W.D.N.C. Mar. 29, 2019) ("[B]ecause the *conduct* Plaintiffs complain of—the assessment of banking fees—is regulated by multiple regulatory agencies, the GFBPA exemption provision applies" (emphasis added)) (applying Georgia law); Gaylord v. Ocwen Loan Servicing, LLC, No. 2:12-CV-00087-WCO, 2013 WL 12291744, at *11 (N.D. Ga. Mar. 27, 2013) (dismissing FBPA claim because "[t]he activities plaintiff points to as consumer transactions relate to deceptive lending practices in the servicing and refinancing of mortgages, which is the *precise conduct* regulated by the federal and state statutes referenced above" (emphasis added)).

In short, the broad interpretation of the FBPA exemption asks whether the *type of transaction* at issue is regulated, while the narrow interpretation asks whether the *specific conduct* alleged is regulated. Many cases (including Ferguson and Deotare, upon which Defendants rely heavily) do not commit to either interpretation because they hold that both the transaction *and* the specific

13

conduct alleged are regulated. See, e.g., Ferguson, 293 S.E.2d at 737 (holding that "insurance transactions are among those types of transactions which are exempt from the [FBPA]," but also finding that the Insurance Code "specifically defines the activity alleged in Ferguson's petition as an unfair or deceptive act or practice"); Deotare, 2018 WL 1470897, at *9 (holding that "[t]he FBPA does not apply in extensively regulated areas of the marketplace such as consumer banking" but also finding that the UCC "expressly regulates [defendant]'s actions and obligations with regard to the transactions at issue"); Stewart v. SunTrust Mortg., Inc., 770 S.E.2d 892, 898 (Ga. Ct. App. 2015) ("Because the mortgage industry is regulated *and* because the specific conduct at issue here is regulated by the GRMA, [plaintiff]'s FBPA claim fails." (emphasis added)); Reese v. Wachovia Bank, N.A., No. 1:08-CV-3461, 2009 WL 10664907, at *2 (N.D. Ga. Feb. 23, 2009) ("The area of mortgage transactions is regulated by the Truth in Lending Act, the Real Estate Settlement Procedures Act, and the Georgia Residential Mortgage Act. *Moreover*, . . . the specific conduct alleged in this case is, in fact, regulated." (emphasis added)); Taylor v. Jacques (In re Taylor), 292 B.R. 434, 440 (Bankr. N.D. Ga. 2002) ("Considering the case law in Georgia which construes the FBPA to exempt conduct in regulated areas of activity *and* the parties' apparent agreement that the conduct at issue is covered by the federal law . . . , the complaint under the FBPA must be dismissed."

14

(emphasis added)); Figueroa v. JP Morgan Chase Bank, N.A., No. 109-CV-1874, 2010 WL 4117032, at *5 (N.D. Ga. Oct. 7, 2010) (holding that the FBPA "does not apply to residential mortgage transactions" but also finding that "[e]ven if [the narrow interpretation] is the correct standard, as opposed to the more general regulation of an industry, Plaintiff's claims ultimately go to deceptive lending practices and failure to follow proper real estate transaction procedures" which are subject to regulations as well).

Like the Ferguson and Deotare line of cases, this case comes out the same way regardless of whether the broad or narrow interpretation is utilized. Count 4 is due to be dismissed because both the type of transaction and the specific conduct alleged are regulated. Defendants' conduct about which Plaintiff complains certainly took place in the context of an insurance transaction. It is not the case, as Plaintiff contends, that Defendants are simply "tortfeasors who happen to be insurance agents" and whose acts and omissions "go far beyond a simple sale of insurance to a customer." See Dkt. No. 21 at 7, 9, 10. The Grammers were put into contact with Defendant Ferlin by Met to discuss the transition of Mrs. Grammer's life insurance from a group policy to an individual one. Dkt. No. 1-1 ¶¶ 23-27. Defendant Ferlin, an insurance agent, directed Defendant Chambers, another insurance agent (albeit not one appointed by Met/Mass), to meet with the

15

Grammers about this conversion. Id. ¶¶ 28–31. Defendant Ferlin allegedly made misrepresentations about his affiliation with Met/Mass, his affiliation with Defendant Chambers, and the details about the policy to which Mrs. Grammer was converting. Id. ¶¶ 33–43. Finally, Defendants submitted erroneous paperwork to the insurer and Mrs. Grammer did not get the policy she requested. Id. ¶¶ 42–44. It cannot be said that this conduct is taken *out* of the insurance-transaction realm and *into* some non-insurance-transaction realm simply because Defendants misrepresented their affiliations and the provisions of the life insurance policy to be issued. Plaintiff's complaint describes unfair or deceptive acts and omissions *during the conversion of a life insurance policy*. This was an insurance transaction.

Furthermore, on a more granular level, each of the alleged acts and omissions is subject to regulation by the Insurance Code. The Code prohibits "unfair or deceptive act[s] or practice[s] in the business of insurance," O.C.G.A. § 33-6-3, and provides a list of examples of such unfair or deceptive acts or practices, including the following:

> (1) Making . . . or causing directly or indirectly to be made . . . [a] statement containing any assertion, representation, or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business, which . . . is untrue, deceptive, or misleading;
>
> (2) Making . . . or causing to be made . . . any . . . statement misrepresenting the terms of any policy issued or to be issued, the benefits or advantages

16

> promised thereby, or the dividends or share of the surplus to be received thereon; . . . or making any misrepresentation to any policyholder insured in any company for the purpose of inducing or tending to induce the policyholder to lapse, forfeit, or surrender his insurance.

O.C.G.A. § 33-6-4(b)(1)–(2). The Code specifically prohibits Defendants from making statements about the business of insurance or any person in the conduct of his insurance business which are "untrue, deceptive, or misleading" *and* prohibits making misleading statements about the terms, benefits, or advantages of "any policy issued or to be issued." Id. Plaintiff's allegations as to Defendants' misrepresenting their affiliation with one another,[5] with Met/Mass,[6] and the terms of the policy itself all seem to fall within this provision.[7] Further, the Code provides that an agent commits a "fraudulent insurance act" if he:

---

[5] Defendant Ferlin's misrepresentation as to Defendant Chambers's affiliation with Met/Mass may also be subject to regulation 120-2-11.10. See Ga. Comp. R. & Regs. 120-2-11-.10.(2)(i) ("No . . . oral presentation may make incorrect[ or] misleading . . . statements about other life insurance . . . agents . . . .").

[6] Defendant Chambers's alleged misrepresentations as to his affiliation with Met/Mass also seem subject to a few other regulations. See O.C.G.A. § 33-23-16(g)(1) ("A nonresident individual agent shall not act as an agent of an insurer unless the agent becomes an appointed agent of that insurer . . . ."); id. § 33-23-4(a)(1) ("A person shall not sell, solicit, or negotiate insurance in this state for any class or classes of insurance unless such person is licensed for that line of authority in accordance with this article and applicable regulations."). Plaintiff argues that "a violation of the[se] . . . licensing requirements [does not] constitute[] a deceptive trade practice under the Insurance Code," dkt. no. 30 at 6, but the narrow interpretation of the FBPA exemption requires only that the conduct alleged be *regulated*—not that it constitute an "unfair practice" under another regulatory regime.

[7] Plaintiff argues that O.C.G.A. § 33-6-4(b)(1) "appears to be wholly related to statements made in media publications and is, accordingly, inapplicable to the instant action." Dkt. No. 30 at 6. Based on the plain language of the statute, this interpretation is incorrect. See O.C.G.A. § 33-6-4(b)(1) (prohibiting *both* "making" deceptive statements *and* "publishing, disseminating, circulating, or placing before the public" such statements (emphasis added)).

17

> Knowingly and with intent to defraud presents, causes to be presented, or prepares with knowledge or belief that it will be presented, to or by an insurer, purported insurer, broker, or any agent thereof, any written statement as part of, or in support of, an application for the issuance of . . . an insurance policy, or . . . other benefit pursuant to an insurance policy, which he knows to contain materially false information concerning any fact material thereto or if he conceals, for the purpose of misleading another, information concerning any fact material thereto . . . .

Id. § 33-1-16(a)(1). Plaintiff's allegations that Defendant Chambers misstated Mrs. Grammer's income, intended beneficiaries, and intended amount of death benefit qualify as presenting an application for a policy or benefit that contains materially false information.

The other deceptive acts which Plaintiff alleges—including Defendant Ferlin's arranging a meeting between Defendant Chambers and the Grammers, Defendant Chambers's having Mrs. Grammer sign a blank form, and Defendant Ferlin's submission of the erroneous paperwork without confirming its accuracy[8]—are part and parcel of the alleged misrepresentations in the conversion of Mrs. Grammer's insurance policy. The deceptive scheme which Plaintiff alleges may have involved several steps or phases, but breaking up the misrepresentations into discrete steps/phases does not change the fact that the misrepresentations themselves are regulated.

---

[8] Plaintiff does not explicitly allege that Defendant Chambers's sale of an unnecessary additional policy to Plaintiff constituted a violation of the FBPA, but to the extent he does, the Court finds that this alleged sale does not constitute an unfair or deceptive act within the scope of the FBPA. Rather, as alleged, it is an expression of buyer's remorse.

18

Ultimately, "[b]ecause the [insurance] industry is regulated and because the specific conduct at issue here is regulated by the [Insurance Code], [Plaintiff]'s FBPA claim fails." Stewart, 770 S.E.2d at 898.

## CONCLUSION

For the reasons stated above, Defendants' Motions to Dismiss Counts Three and Four, dkt. nos. 17 and 18, are **GRANTED**.

**SO ORDERED**, this 29th day of October, 2020.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA